## BRIDGE COMPANY *v.* UNITED STATES.

1. Congress, in the exercise of its power over the navigable waters of the United States, which is derived from the commerce clause of the Constitution, gave, by resolution (*infra*, p. 473), its assent that a bridge across the Ohio at Cincinnati might be constructed in accordance with the terms of a charter conferred by State laws; but in case the free navigation of the river should at any time be substantially and materially obstructed by the contemplated bridge, the right to withdraw such assent, or to direct the necessary modifications and alterations, was reserved. While the bridge was erecting, in compliance with the provisions of law, Congress, by statute (*infra*, p. 473), declared that it should be unlawful to proceed therewith, unless certain specified changes should be made. The company made them, and completed the bridge according to the altered plan. *Held*, 1. That in view of the legislation of Congress the resolution is the paramount law by which the rights involved are to be determined, and that the company, by accepting its provisions, became subject to all the limitations and reservations of power which Congress deemed fit to impose. 2. That the withdrawal by Congress of its assent is, for the purposes of this case, equivalent to a positive enactment that, notwithstanding State legislation, the further maintenance of the bridge according to the plan first prescribed was unlawful. 3. That Congress, by requiring changes and modifications to which the company conformed, incurred no liability to the latter.

2. Congress could withdraw its assent whenever it determined that in regard to the construction of the bridge other requirements than those originally prescribed were essential to secure due protection to the navigation of the river.

APPEAL from the Circuit Court of the United States for the Southern District of Ohio.

On the 5th of February, 1868, the General Assembly of Kentucky passed an act to incorporate the Newport and Cin-

cinnati Bridge Company, with power to build a bridge across the Ohio River between Newport and Cincinnati. This charter provided " that the said bridge shall be constructed so as not to obstruct the navigation of the Ohio River further than the laws of the United States authorize."

On the 3d of April, in the same year, the General Assembly of Ohio enacted a statute authorizing the creation and organization of corporations to build bridges across the same river. This act, in order that the bridges to be built might not obstruct navigation, provided that they should be erected " in accordance with the provisions of an act of Congress approved July 14, 1862, entitled ' An Act to establish certain post-roads,' or of any act that Congress may hereafter pass on the same subject." Its eleventh section is as follows : —

" SECT. 11. That any such company may fix or change the span and altitude of any bridge which it may erect and construct across the Ohio River : *Provided,* that the span of any such bridge be not less than three hundred feet in the clear over the main channel, and not less than two hundred and twenty feet in the clear in one of the next adjoining spans, and the height of the bridge in the centre of the span over the main channel shall not be less than one hundred feet above the surface of the water at low water, measuring for such elevation to the bottom chord of the bridge, and such height above extreme high-water mark as may be provided in any act of Congress now in force, or which may hereafter be passed ; but this section shall not apply to any bridge built with a draw, in accordance with the provision of an act of Congress approved July 14, 1862, entitled ' An Act to establish certain post-roads,' or any act that Congress may hereafter pass upon the subject."

On the same day this act was passed, the Newport and Cincinnati Bridge Company was organized under it in Ohio to build a bridge between Cincinnati and Newport. Afterwards, on the 16th of April, 1868, the Kentucky and Ohio companies, pursuant to provisions in their respective charters, were consolidated, and became one corporation, with the general powers which the divisional companies originally possessed.

The material provisions of the act of July 14, 1862, c. 167, entitled " An Act to establish certain post-roads " (12 Stat. 569), are as follows: —

" SECT. 3. *And be it further enacted,* that it shall be lawful for any other railroad company or companies whose line or lines of road may now or shall hereafter be built to the Ohio River above the mouth of the Big Sandy River, in accordance with the terms of the charter or charters of such company or companies, to build a bridge across said river for the more perfect connection of any such roads, and for the passage of trains thereof, under the limitations and conditions hereafter provided.

" SECT. 4. *And be it further enacted,* that any bridge erected under the privileges of this act may, at the option of the company or companies building the same, be built either as a drawbridge, with a pivot or other form of draw, or with unbroken or continuous spans: *Provided,* that if the said bridge shall be made with unbroken and continuous spans, it shall not be of less elevation than ninety feet above low-water mark over the channel of the said river, nor in any case less than forty feet above extreme high water, as understood at the point of location, measuring for such elevation to the bottom chord of the bridge. Nor shall the span of such bridge covering the main channel of the river be less than three hundred feet in length, with also one of the next adjoining spans of not less than two hundred and twenty feet in length, and the piers of said bridge shall be parallel with the current of the river as near as practicable: *And provided also,* that if any bridge built under this act shall be constructed as a drawbridge, the same shall be constructed with a span over the main channel of the river, as understood at the time of the erection of the bridge, of not less than three hundred feet in length, and said span shall not be less than seventy feet above low-water mark, measuring to the bottom chord of the bridge, and one of the next adjoining spans shall not be less than two hundred and twenty feet in length; and also that there shall be a pivot draw constructed in every such bridge at an accessible and navigable point, with spans of not less than one hundred feet in length on each side of the central or first pier of the draw: *And provided also,* that said draw shall always be opened promptly, upon reasonable signal, for the passage of boats whose construction may not, at the time, admit of their passing under the permanent spans of said bridge, except that said draw shall not be required to be opened when engines or

trains are passing over said bridge, or when passenger trains are due; but in no case shall unnecessary delay occur in the opening of said draw after the passage of said engines or trains."

On the 3d of March, 1869, Congress passed a resolution entitled " A resolution giving the assent of the United States to the construction of the Newport and Cincinnati bridge." 15 Stat. 347. It is as follows: —

" *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* that the consent of Congress be, and the same is hereby, given to the erection of a bridge over the Ohio River from the city of Cincinnati, Ohio, to the city of Newport, Kentucky, by the Newport and Cincinnati Bridge Company, a corporation chartered and organized under the laws of each of the States of Kentucky and Ohio: *Provided,* that said bridge is built with an unbroken or continuous span of not less than four hundred feet in the clear, from pier to pier, over the main channel of the river, and is built in all other respects in accordance with the conditions and limitations of an act entitled ' An Act to establish certain post-roads,' approved July fourteenth, eighteen hundred and sixty-two. That said bridge, when completed in the manner specified in this resolution, shall be deemed and taken to be a legal structure, and shall be a post-road for the transmission of the mails of the United States; but Congress reserves the right to withdraw the assent hereby given in case the free navigation of said river shall at any time be substantially and materially obstructed by any bridge to be erected under the authority of this resolution, or to direct the necessary modifications and alterations of said bridge."

After the passage of this resolution, the consolidated company began the erection of a drawbridge with a pivot draw, and expended a large amount of money in the undertaking, but before it was completed, Congress passed the act of March 3, 1871, c. 121, the fifth section of which (16 id. 572) is as follows:

" SECT. 5. That it shall be unlawful for the Newport and Cincinnati Bridge Company, or any other company or person, to proceed in the erection of the bridge now being constructed over the Ohio River, from the city of Cincinnati, Ohio, to the city of Newport, Kentucky, and the approaches thereto, unless the said bridge shall be so constructed that the channel span of four hundred feet, as now located, shall have under said span a clear headway at low

water, of one hundred feet below any point of said channel span, and in such case no draw shall be required in said bridge; all the other spans of said bridge, which cover the Ohio River to low-water mark, shall have a clear headway of not less than seventy feet above low-water mark; and the other spans of the said bridge, extending to each shore, may be made of less elevation than seventy feet above low-water mark, to accommodate a regular grade for the approaches to said bridge. And when the foregoing requirements shall have been complied with by the said Newport and Cincinnati Bridge Company, the location of said bridge, its structures and approaches, shall thereupon be deemed to be legalized, and declared to be lawful structures, and shall be recognized and known as a post-route. The plans for changes in such bridge made necessary by this act shall be submitted by said company to the Secretary of War for his approval. And in the event of the bridge company making the changes provided for in this act, it shall be lawful for the said company, after they shall have made the changes in said bridge, and the approaches thereto, as herein provided, to file their bill in equity, against the United States in the Circuit Court of the United States for the Southern District of Ohio, and full jurisdiction is hereby conferred upon said court to determine: First, whether the bridge, according to the plans on which it has progressed, at the passage of this act, has been constructed so as substantially to comply with the provisions of law relating thereto; and, second, the liability of the United States, if any there be, to the said company, by reason of the changes by this act required to be made, and if the said court shall determine that the United States is so liable, and that said bridge was so being built, then the said court shall further ascertain and determine the amount of the actual and necessary cost and expenditures reasonably required to be incurred in making the changes in the said bridge and its approaches, as hereby authorized or required, in excess of the cost of building said bridge and approaches according to the plan proposed before the changes required by this act to be made. And the said court is hereby further authorized and required to proceed therein to final decree, as in other cases in equity. And it shall be lawful for either party to the said suit to appeal from the final decree of the said Circuit Court to the Supreme Court of the United States, as in other cases, and the Supreme Court shall thereupon proceed to hear and determine the said case, and make a final decree therein; and thereupon, if such decree shall be in favor of said company, the Secretary of the Treasury of the United States shall, out of any

moneys in the treasury not otherwise appropriated, pay to the said company such sum of money as shall by the said Supreme Court be so decreed to be paid to the said company : *Provided, nevertheless*, that no money shall be paid by the Secretary of the Treasury to the said company until the Supreme Court of the United States, upon appeal taken as aforesaid, shall render a final decree in the case in favor of said company." .

The company promptly yielded to these new requirements, and, having completed its bridge on the altered plan, brought in the court below this suit in equity against the United States to recover the increased cost. After hearing, the court dismissed the bill, and from that decree this appeal was taken.

*Mr. William M. Ramsey* for the appellant.

*The Attorney-General* and *the Solicitor-General* for the United States.

MR. CHIEF JUSTICE WAITE, after stating the case, delivered the opinion of the court.

The first question which presents itself is, whether, on the face of the several acts of Congress, any liability rests on the United States to pay the bridge company the cost of the change that was directed in the plan of its bridge. It cannot be denied that but for the act of 1871 a bridge built according to the original plan would have been a lawful structure which the company could have maintained until Congress withdrew its assent, or required alterations to be made. The paramount power of regulating bridges that affect the navigation of the navigable waters of the United States is in Congress. It comes from the power to regulate commerce with foreign nations and among the States. *Willson* v. *Black Bird Creek Marsh Co.*, 2 Pet. 245 ; *State of Pennsylvania* v. *Wheeling, &c. Bridge Co.*, 18 How. 421 ; *Gilman* v. *Philadelphia,* 3 Wall. 713 ; *The Clinton Bridge,* 10 id. 454 ; *Railroad Company* v. *Fuller,* 17 id. 560 ; *Pound* v. *Turck,* 95 U. S. 459 ; *Wisconsin* v. *Duluth,* 96 id. 379. That the Ohio is one of the navigable rivers of the United States must be conceded. It forms a boundary of six States, and the commerce upon its waters is very large.

No question can arise in this case upon what the States have done, for both Ohio and Kentucky required the company to

comply with the regulations of Congress. Neither are we called on to determine what would have been the rights of the company if in the original license no power of future control by Congress had been reserved. The resolution on which the company relies contains this distinct provision: "But Congress reserves the right to withdraw the assent hereby given in case the free navigation of said river shall at any time be substantially and materially obstructed by any bridge to be erected under the authority of this resolution, or to direct the necessary modifications and alterations of said bridge." An examination of the legislation of Congress in reference to the bridging of streams shows this to have been at that time a new provision. It had appeared but once before, and then in the act of Feb. 19, 1869, c. 37 (15 Stat. 272), passed at the same session of Congress, authorizing a bridge across the Connecticut at Middletown.

The first enactment by Congress on this general subject is found in sects. 6 and 7 of the act of Aug. 31, 1852, c. 111, making appropriations for the Post-Office Department (10 Stat. 112), which declared the bridge across the Ohio at Wheeling then existing to be a lawful structure. This act simply gave the bridge company leave to maintain a bridge already built, and reserved no power of future control. Next followed, ten years after, the act of July 14, 1862, c. 167 (12 id. 569), which legalized a bridge then in the course of construction across the Ohio at Steubenville, and contained the general provisions as to bridging the Ohio above the mouth of the Big Sandy, referred to in the resolution of March 3, 1869. In this act, also, there was no reservation of power by Congress. The next was the act of Feb. 17, 1865, c. 38 (13 id. 431), by which the act of July 14, 1862, was amended so as to authorize the erection of a bridge across the Ohio at Louisville. In this, too, there was no reservation of power, but specific directions were given as to the height of the bridge, the number and location of draws, and the length of spans, and it was expressly provided that all should be so constructed as not to interrupt navigation. The same day another act was passed, c. 39 (id. 431), by which a bridge across the Ohio between Cincinnati and Covington, then being built in accordance with

the laws of Ohio and Kentucky, was declared to be a lawful structure, and no power reserved. There was no further legislation of this character until the act of July 25, 1866, c. 246 (14 Stat. 244), which authorized eight bridges across the Mississippi at and above St. Louis, and one across the Missouri. This act provided that, " in case of any litigation arising from any obstruction or alleged obstruction to the free navigation of said river, the cause may be tried before the District Court of the United States of any State in which any portion of said obstruction or bridge touches ; " and sect. 13 was as follows : " That the right to alter or amend this act, so as to prevent or remove all material obstructions to the navigation of said river by the construction of bridges, is hereby expressly reserved." The act of Feb. 27, 1867, c. 98 (14 id. 412), legalized the Clinton bridge across the Mississippi, and by the act of Feb. 21, 1868, c. 10 (15 id. 37), the act of July 25, 1866, was extended so as to include a bridge over the Mississippi at La Crosse. By the act of July 6, 1868, c. 134 (id. 82), a bridge across Black River in Ohio was authorized. Afterwards, by the act of July 20, 1868, c. 179 (id. 121), two other bridges were authorized across the Missouri. In all these acts the power of alteration and amendment was reserved in the exact language employed in the act of 1866.

This brings the history of congressional legislation on the subject of bridging the public waters of the United States down to the session of Congress when the resolution in favor of the Newport and Cincinnati Bridge Company was passed, and when, as has already been seen, the peculiar form of reservation which appears in that resolution was for the first time introduced. Two licenses were granted at that session, — one by the act of Feb. 19, 1869, c. 37 (id. 272), to cross the Connecticut, and the other by the resolution now in question, and both contained this reservation. On the same day the resolution was adopted Congress passed the act of March 3, 1869, c. 139 (id. 336), to legalize the bridge across the East River, between New York and Brooklyn, in which " power at any time to alter, amend, or repeal " was in express terms and without any limitation reserved.

From this it seems to us clear that the peculiar language of

the reservation now in question was intended to have a special signification. It had been considered enough before to provide that, "to prevent or remove all material obstructions to navigation," the "right to alter or amend," expressed in the usual form, be reserved. But when power was given to build below the Big Sandy a bridge such as had before only been built above, it was deemed expedient, in the interest of commerce, to be more specific, and by reserving the power to withdraw the assent of Congress to what might prove to be an obstruction to navigation, to imply at least a reservation of power to make that unlawful which, while the assent continued, would be lawful. That this is what was intended by the language used may fairly be inferred from earlier legislation on the same general subject. Thus, as early as by the act of March 2, 1805, c. 30 (2 Stat. 330), Congress, in authorizing the grant of leave to a bridge company to build a bridge across a mill-pond and marsh in the navy-yard at Brooklyn, N. Y., provided, "that if at any future time it shall appear to the President of the United States that the property of the United States is injured by such bridge, he may revoke the permission granted by him for erecting the same." Afterwards, by the act of March 3, 1855, c. 198 (10 id. 675, 680), the Secretary of the Navy was authorized to permit another bridge company to connect its bridge with the navy-yard at Kittery, Me., and to have a right of way through the yard to the bridge, but it was provided that the bridge and the right of way might be discontinued at any time by the Secretary. It surely could not be claimed that if, under the power reserved in these cases, the President had revoked the permission given in respect to the bridge at the Brooklyn yard, or the Secretary had discontinued that at Kittery, the United States would be either legally or morally bound to make good the loss sustained by the companies, or either of them, on that account. And the reason is, that the language in which the power reserved was expressed clearly implied that all the risks of revocation and discontinuance were to be assumed by those to whom the grants thus limited were made. So here, in assenting to an untried experiment, and one which might prove to be materially detrimental to the navigation of an important stream, Congress thought proper to reserve the right to

withdraw its assent, — revoke its permission, — if what might possibly happen should, in fact, come as the consequence of the new authority which was granted. To "withdraw assent" is the same as to "revoke permission," and what would be implied from one form of expression will be, under like circumstances, from the other. It is true, in the case of the navy-yards, Congress had absolute jurisdiction, and the States were excluded altogether. But the power of Congress in respect to legislation for the preservation of inter-state commerce is just as free from State interference as any other subject within the sphere of its legislative authority. The action of Congress is supreme, and overrides all that the States may do. When, therefore, Congress in a proper way declares a bridge across a navigable river of the United States to be an unlawful structure, no legislation of a State can make it lawful. Those who act on State authority alone necessarily assume all the risks of legitimate congressional interference. In the present case, both the Ohio and Kentucky divisional companies were, by express provisions in their respective charters, subjected to this paramount controlling power. The consolidated company was, therefore, prohibited from obstructing navigation more than the laws of the United States authorized, and was required to build its bridge in accordance with the provisions of the act of 1862, or any other law that Congress might thereafter pass on the subject. Hence the resolution of 1869 became, by the operation of both congressional and State enactments, the law on which the rights of the company depend. It was the paramount license for the erection and maintenance of the bridge; and the company, by accepting its provisions, became subject to all the limitations and reservations of power which Congress saw fit to impose.

From this we conclude that the withdrawal by Congress of its assent to the maintenance of the bridge, when properly made, is, for all the purposes of this case, equivalent to a positive enactment that from the time of such withdrawal the further maintenance of the bridge shall be unlawful, notwithstanding the legislation of the several States upon the subject. If modifications are directed, assent is, in legal effect, withdrawn, unless the required changes are made.

It is contended, however, that under the terms of the reser-

vation the assent of Congress could not be withdrawn until it had been in some way judicially ascertained that the bridge, as authorized, either did in fact, or would if built, substantially and materially obstruct free navigation. Such, we think, is not the fair meaning of the language employed. In *State of Pennsylvania* v. *The Wheeling, &c. Bridge Co.* (13 How. 518), it was judicially settled in this court that a bridge as constructed did illegally interfere with navigation ; but when afterwards Congress, in the exercise of its constitutional authority to regulate commerce, legalized the structure by a legislative enactment, the court held (18 How. 421) that this act of legislative power removed the objection to the further continuance of the bridge, because, in the opinion of the legislative department of the government, the obstruction which had been erected was no more than those interested in navigation should submit to for the general good. It is to be observed that the question now under consideration is not whether the bridge company has failed to comply with the requirements of the resolution, but whether those requirements are all that the due protection of free navigation demands. The first is undoubtedly a proper subject for judicial inquiry, but the last, as we think, belongs to the legislature. Congress, which alone exercises the legislative power of the government, is the constitutional protector of foreign and inter-state commerce. Its supervision of this subject is continuing in its nature, and all grants of special privileges, affecting so important a branch of governmental power, ought certainly to be strictly construed. Nothing will be presumed to have been surrendered unless it was manifestly so intended. Every doubt should be resolved in favor of the government. As Congress can exercise legislative power only, all its reservations of power, connected with grants that are made, must necessarily be legislative in their character. In the present case the reservation is of power to withdraw the assent which was given, and to direct the necessary modifications and alterations. This was to be done in case the free navigation of the river should at any time be substantially and materially obstructed under the authority which was granted. It was originally a proper subject of legislative inquiry whether the resolution made sufficient provision for the protection of

commerce. There is nothing to indicate that any different inquiry was to be instituted to determine whether the assent that had been given should be withdrawn, and as the withdrawal involved an act legislative in its character, the necessary presumption is that the inquiry on which it was to be predicated would be legislative also. No provision is made for instituting proceedings to have the question determined judicially, and even if the courts should determine that the bridge did substantially and materially obstruct navigation, Congress could not be compelled to withdraw its assent to the further continuance of the structure. This is evident from the *Wheeling Bridge Case*, where, as has been seen, congressional assent to a substantial obstruction was recognized as sufficient to prevent the execution of a decree of this court requiring the abatement of what, but for this assent, would have been, in the judgment of the court, a public nuisance. The withdrawal of assent, therefore, has been left to depend on the judgment of Congress in the exercise of its legislative discretion. For this purpose Congress must make its own inquiries, and determine for itself whether the obstruction that has been authorized is so material and so substantial as to justify, under all the circumstances of the case, an exercise of the power which was reserved as a condition of the original grant made.

It is next insisted that if in the judgment of Congress the public good required the bridge to be removed, or alterations to be made in its structure, just compensation must be made the company for the loss incurred by what was directed. It is true that one cannot be deprived of his property without due process of law, and that private property cannot be taken for public use without just compensation. In the present case the bridge company asked of Congress permission to erect its bridge. In response to this request permission was given, but only on condition that it might be revoked at any time if the bridge was found to be detrimental to navigation. This condition was an essential element of the grant, and the company in accepting the privileges conferred by the grant assumed all risks of loss arising from any exercise of the power which Congress saw fit to reserve. What the company got from Congress was the grant of a franchise, expressly made defeasible at

will, to maintain a bridge across one of the great highways of commerce. This franchise was a species of property, but from the moment of its origin its continued existence was dependent on the will of Congress, and this was declared in express terms on the face of the grant by which it was created. In the use of the franchise thus granted, the company might, and it was expected would, acquire property. The property thus acquired Congress could not appropriate to itself by a withdrawal of its assent to the maintenance of the bridge that was to be built, but the franchise, by express agreement, was revocable whenever in the judgment of Congress it could not be used without substantial and material detriment to the interest of navigation. A withdrawal of the franchise might render property acquired on the faith of it, and to be used in connection with it, less valuable; but that was a risk which the company voluntarily assumed when it expended its money under the limited license which alone Congress was willing to give. It was optional with the company to accept or not what was granted, but having accepted, it must submit to the control which Congress, in the legitimate exercise of the power that was reserved, may deem it necessary for the common good to insist upon.

We are aware that this is a power which may be abused, but it is one Congress saw fit to reserve. For protection against unjust or unwise legislation, within the limits of recognized legislative power, the people must look to the polls and not to the courts. It would be an abuse of judicial power for the courts to attempt to interfere with the constitutional discretion of the legislature.

What has been done seems to have been with due regard to the rights of all concerned. The Constitution made it the duty of Congress to protect all commerce which extends beyond State lines against obstruction by or under the authority of the States. Two States had been applied to for leave to bridge an important national river. They gave the leave, but made it subject to the constitutional control of Congress. Congress, when applied to, assented to what was wanted, but in express terms reserved to itself the power to revoke what had been done, or require alterations to be made, in case experience proved that the structure which was to be put up

substantially and materially interfered with navigation. Under this authority work was at once begun. The next year, by the act of July 10, 1870, c. 240, sect. 5 (16 Stat. 227), making large appropriations for the improvement of rivers and harbors, the Secretary of War was required to detail three engineers to examine all the bridges erected or in the process of erection across the Ohio, and report to the next Congress whether, in their opinion, such bridges, or any of them, as constructed or proposed to be constructed, did or would interfere with free and safe navigation; and if they did or would so interfere, to report what extent of space and elevation above water would be required to prevent obstruction, and an estimate of the cost of changing the bridges built, and in the process of building, so as to conform to what was recommended. At the next session the act was passed which required the Newport and Cincinnati Company to alter its bridge, and allowed this suit to be brought for the purpose of determining whether any liability for pecuniary damages had been incurred by the United States to the company for what was done. In this way Congress recognized fully the obligation resting on every government, when it is guilty of a wrong, to make reparation. Exemption from suit does not necessarily imply exemption from liability. Here Congress gave the courts jurisdiction to determine whether a wrong had been done, and, if so, to award compensation in money by the payment of the cost of what had been improperly required. In our opinion Congress did no more than it was authorized to do, and there is no liability resting on the United States to answer in damages.

It is next insisted that by the terms of the statute authorizing the suit the liability of the United States is established, if it shall be determined that the bridge, as far as it had progressed, was "constructed so as to substantially comply with the provisions of law relating thereto." We do not so understand the statute. The language is as follows: "Full jurisdiction is hereby conferred upon said cour* o determine: *first*, whether the bridge, according to the plans on which it has progressed, at the passage of this act, has been constructed so as substantially to comply with the provisions of law relating

thereto; and, *second*, the liability of the United States, if any there be, to the said company, by reason of the changes by this act required to be made, and if the said court shall determine that the United States is so liable, and that said bridge was so being built, then the said court shall further ascertain and determine the amount of the actual and necessary cost and expenditures," &c.

The rule of damages has been fixed by the statute. As to that the court has no discretion beyond ascertaining the excess of cost. But before damages can be given, it must appear both that the United States was, in law, liable, and that the bridge had been constructed in accordance with the requirements of the law, down to the time the change of plan was directed. That the liability of the United States was not made to depend entirely on the fact that the law in respect to the form of the structure had been complied with is apparent, because if such had been the intention of Congress it would have been entirely unnecessary to submit the second question for determination. But the second is as clearly submitted as the first. Damages are not to be given if either is found in favor of the United States. No matter whether the United States was, in law, liable or not, if the bridge had not been constructed so as substantially to comply with the law, there could be no recovery. That is expressly declared. If, however, it had been properly built, the determination of the question of legal liability became important, and that, in our opinion, depended entirely on the right of Congress, under the Constitution and laws of the United States, to require the change without making just compensation in money.

*Decree affirmed.*

MR. JUSTICE MATTHEWS did not sit in this case, nor take any part in deciding it.

MR. JUSTICE MILLER, MR. JUSTICE FIELD, and MR. JUSTICE BRADLEY dissented.

MR. JUSTICE MILLER. I dissent from the decree of the court in this case, and as I cannot agree to all the grounds on which my brother Field dissents, I will state very briefly the

reasons which have seemed to me to require the reversal of the decree of the Circuit Court.

Congress gave its assent in the most solemn form, by the resolution of 1869, to the erection of a bridge over the Ohio River by the appellant company, the character of which was described in the resolution. It reserved the right to withdraw the assent thus given in case the free navigation of the river should at any time be substantially and materially obstructed by any bridge to be erected under the authority of this resolution, or to direct necessary modifications and alterations of said bridge. The Circuit Court finds that up to the third day of March, 1871, the bridge company had proceeded in the erection of their bridge, " in all respects constructing the same so as substantially to comply with the provisions of the law relating thereto."

On that day Congress passed the act under which this suit is brought; and it is upon the construction of this act in connection with the resolution of 1869 that the decision of this case must turn.

It will be observed that the resolution reserved to Congress a right to interfere and assert its power only in case the bridge of the appellant should at any time *substantially and materially* obstruct the free navigation of the river; and, in that event, the reservation was that Congress might withdraw the assent so given to the erection of the bridge, *or* direct the necessary modifications and alterations of said bridge. It is not necessary to inquire whether Congress could do both these things or not, for it did not, as I understand the language of the act of March 3, 1871, c. 121, withdraw or intend to withdraw its assent previously given.

It did exercise the alternative power given by the joint resolution, and " direct the necessary modifications and alterations of said bridge."

The legislation by which this is done is the fifth and last section of an act making appropriations for the service of the Post-Office Department.

It is important to observe that it contains no declaration that the bridge, as then constructed or in process of construction, would either partially or substantially obstruct the navigation

of the Ohio River, nor does this court base its decree on the existence of that fact. Nor do counsel in the argument before us insist that this was proved, or that it was a necessary condition to the exercise of the power which Congress assumed in passing the statute requiring alterations in construction of the bridge, costing over $200,000.

Why did not Congress declare as a reason for the exercise of this power that the bridge as originally authorized by it was or would be an obstruction to navigation? and why did it not content itself with making that declaration and withdrawing its assent, as it would then have a right to do?

The best answer to this question, the most reasonable one to be made, and the one most consistent with the evidence in this record, is that either the fact did not exist, or was not so apparent, that Congress was willing to found any action on it.

But Congress, with this view of that question, and entertaining also a just view of its powers and obligations as regards the appellant and the bridge, determined to exercise such power as it had, for the purpose of changing the structure from a drawbridge, to a bridge so high above the water that no draw was necessary.

It did this; but in the same section which prescribed this change and forbade the company to proceed in any other mode of construction, it provided equitable relief for the injury which this somewhat arbitrary act of power inflicted on the Bridge Company.

I repeat that it was competent for Congress to have declared that the bridge, as it was in process of construction, had proved to be a substantial and material obstruction to the free navigation of the river, and for that reason the assent of Congress to its erection was withdrawn. Or that it would be such an obstruction unless certain modifications of the plan were made, which Congress could prescribe, and require them to be made. But it did neither. It based no action on the assumption that the bridge was or would be an obstruction to navigation; but it determined to change the bridge from a low bridge with a draw, to a high bridge without a draw. The difference in these two is well known to every one who has travelled over

our Western rivers, and I myself am familiar with no less than ten drawbridges across the Mississippi built under acts of Congress, which are not substantial or material obstructions to the navigation of that great river.

Congress, therefore, never intended to act on the reservation contained in the resolution. No reference is made to that resolution in the act of 1871 requiring this total change of plan.

Nothing is more reasonable, therefore, than that Congress, resorting to its high prerogative of requiring a structure which would not only be no *substantial* or *material* obstruction to navigation, — words well understood, — but one which would impose no delay in passing it, nor interfere in the slightest possible manner with navigation, should see that equity and justice required compensation for the loss inflicted by this change.

It *did* see this, and provided for the situation. Until the structure was completed, no one could tell the cost of the changes required. When completed, the safest tribunal, as Congress thought, to determine this was a court. And that the court might not be restricted by the rigid rules of a court of law, it referred the matter to a court of equity, with instructions to proceed as in other cases in equity. It required the court to determine " the actual and necessary costs and expenditures reasonably required to be incurred in making the changes ordered," and it instructed the Secretary of the Treasury to pay the amount so found.

It required the court to ascertain, " first, whether the bridge, according to the plans on which it has progressed at the passage of this act, has been constructed so as to substantially comply with provisions of law relating thereto." The court found that the bridge was in conformity to law, including, of course, the joint resolution giving the assent of Congress. " Second, the liability, if any there be, of the United States to said company by reason of the changes by this act required."

The whole argument of the opinion of the court is founded on the potentiality of this, " *if any there be.*" And the whole scheme and purpose of the joint resolution, its assent with qualified power of withdrawal, the failure of Congress to

declare the existence of the condition on which this right of withdrawal was to be exercised, the fact that the law required the court to find whether the appellant had proceeded according to law, and that the court found it had so proceeded; the great loss which the appellant was compelled to bear, and the reference of the whole matter to a *court of equity*, are all ignored, that we may throw ourselves back on the general and absolute power of Congress, over navigable waters, to defeat this eminently just claim for losses, growing out of the exercise of that power. It is impossible for me to believe that Congress went through all this tedious legal machinery to have the court decide upon its *right* to exercise such a power without responsibility. It is not the habit of that body to refer intentionally the question of its constitutional power to the courts of the country.

Nor is such construction of the words "if any there be" necessary. There were two contingencies in which Congress might have acted, as it did, without incurring any just obligation to make compensation. One of these was that the bridge might not have been built in conformity to the terms of the joint resolution, and in that event the company was in no condition to complain of the action of Congress requiring a change. The act required this fact to be ascertained by the court, and it evidently meant that no damages should be awarded unless it was found that the law was complied with.

Congress might, also, while declining to ascertain for itself whether the bridge, as authorized, was likely to prove *a substantial and material* obstruction to navigation, have made compensation for the change they ordered to depend upon the existence or non-existence of that fact, and left it to the court to determine.

This court refuses to inquire into this latter question, and notwithstanding the fact, which the court was expressly required to find, is found in favor of the appellant, it proceeds on what I think is a fallacious view of the statute, namely, that Congress intended to refer to the court the question of its constitutional power to change the character of the bridge, and it decides in favor of that power, thus disregarding the whole

structure of the two acts on which the right to compensation is based.

I think Congress intended to waive that question, and in favor of justice and fair dealing to pay for the losses incurred under the very act which gave the compensation, if it was found that the bridge, as far as it had progressed, was in conformity to law, and would not be a substantial and material obstruction to navigation if completed on that plan.

MR. JUSTICE FIELD.   I am not able to agree with the majority of the court in their judgment in this case, nor in the reasons assigned for it.   Their opinion proceeds upon a theory of the power of Congress over bridges crossing navigable waters to which I cannot assent.   Its power to authorize the construction of such bridges not being conferred in express terms by the Constitution, must, if it exist, be deduced from the power to regulate commerce with foreign nations and among the several States.   This latter power authorizes Congress to prescribe rules by which commerce in its various forms may be conducted between our people and those of other countries, and between the people of different States; and also to adopt measures to facilitate and increase it.   When the Constitution was adopted, commerce with foreign nations and even between the several States was carried on principally by means of vessels.   Its regulation, therefore, required such control over our harbors, bays, and navigable streams connecting them or different States, as might be necessary to keep navigation free from unnecessary obstructions; and might legitimately extend to making such improvements as would facilitate the passage of vessels, render their anchorage safe, and expedite the discharge of their cargoes and the landing of their passengers and crews.   To this extent its power over navigable waters goes, under the commercial clause; no further.   Unless, therefore, the free navigation of the public waters is impeded by what a State may do or permit, Congress cannot interfere with its action.   And what is meant by their free navigation I shall hereafter explain.   The doctrine of a paramount power in Congress over bridges crossing navigable streams — either to authorize their construction, or regulate them, that is, control them when con-

structed — derives no support from its power to protect the free navigation of such streams.  If a bridge, for example, built under the law of a State, should cross a navigable stream, at so high a point, and in such a way, as in no manner to obstruct its free navigation, Congress could not interfere with the structure.  Its permission would not authorize the building, nor its command authorize the removal, of the bridge.  And while Congress may declare that bridges of particular height and dimensions shall not be deemed an obstruction to the free navigation of the streams, it cannot interfere with bridges of a different size and character, unless they prove to be an impediment to such navigation.

Of course, should Congress undertake the construction of a road for the postal service, or other national purposes, it might authorize the erection of a bridge over navigable streams, to connect the road on opposite sides.  But it is not of such works, or of bridges connecting them, that we are speaking; but of bridges built under the law of a State, and of the power which Congress has to interfere with and control them.

This view of the limits of the power of Congress will be more clearly apparent, if we consider it in connection with the construction of docks, wharves, and piers.  Some of our bays and harbors are miles in width.  Such is the size of the bays of New York and of San Francisco; and some of the streams upon which piers and wharves are built, like the Mississippi and the Hudson, are over a mile in width.  The several States own the soils under tide-waters within their limits.  Speaking on this subject with reference to lands under the tide-waters of the bay of San Francisco, this court said: "Upon the admission of California into the Union upon equal footing with the original States, absolute property in, and dominion and sovereignty over, all soils under the tide-waters within her limits passed to the State, with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper, subject only to the paramount right of navigation over the waters, so far as such navigation might be required by the necessities of commerce with foreign nations or among the several States, the regulation of which was vested in the general government."  *Weber* v. *Harbor Commi'ioners*, 18 Wall. 57.

The same doctrine was previously asserted in *Pollard's Lessee* v. *Hagan*, 3 How. 212; in *Martin* v. *Waddell*, 16 Pet. 367; in *Mumford* v. *Wardwell*, 6 Wall. 423, 436; and subsequently in *McCready* v. *Virginia*, 94 U. S. 391. The State of California, exercising her right of disposition of such soils, granted in 1851 to the city of San Francisco a large tract of land covered by the tide-waters of the bay; and since then the tract has been filled up, and wharves, piers, streets, and blocks of buildings of the most permanent and costly character have been constructed upon it. The bay being miles in width, its free navigation is in no way impeded by the new blocks of buildings and streets, where vessels once floated and cargoes were discharged.

Now, the control of Congress over the bay is as complete and unrestricted as over the navigable streams of the State. Could it in the exercise of its commercial power, that is, in its control over navigation, direct the destruction of the wharves, the buildings, and streets, which have been built where, in 1850, the tide-waters of the bay flowed? I doubt whether any jurist could be found who would hazard his reputation by giving an affirmative answer. And why not? Simply because until the free navigation of the bay for purposes of commerce is impeded, Congress has no power to interfere with the buildings and wharves constructed.

There are wharves and piers constructed, under State authority, at New York City, where the waters of the Hudson once flowed. There are wharves and piers in all our bays and harbors which are built in their waters. But as these structures do not interfere with the free navigation of the river in the one case, nor of the bays and harbors in the other cases, no judge or jurist has ever ventured to assert a power in Congress to order their removal at its pleasure; and simply because the right of interference on its part does not arise until the free navigation of the waters is obstructed. On what possible ground, then, can Congress order the removal of bridges built over navigable streams, under authority of the States, when they do not interfere with the free navigation of the streams? With the most careful consideration I can give to the subject I am unable to find any. To me it seems clear that no such arbitrary power exists.

The power of the State over its internal commerce must also be considered in treating of this subject. While the Constitution vests in Congress the power to regulate commerce among the several States, it leaves with each the regulation of its internal commerce. "Comprehensive," says Mr. Chief Justice Marshall, "as the word 'among' is, it may be very properly restricted to that commerce which concerns more States than one," and "the completely internal commerce of a State, then, may be considered as reserved for the State itself." *Gibbons* v. *Ogden*, 9 Wheat. 1, 195. The jurisdiction of the State over the navigable waters within its limits, so far as may be necessary for the regulation of its internal commerce, is as complete as the jurisdiction of Congress over them for the regulation of inter-state or foreign commerce. On this subject we said, in *County of Mobile* v. *Kimball:* "The States have as full control over their purely internal commerce as Congress has over commerce among the several States and with foreign nations; and to promote the growth of that internal commerce, and insure its safety, they have an undoubted right to remove obstructions from their harbors and rivers, deepen their channels, and improve them generally, if they do not impair their free navigation, as permitted under the laws of the United States, or defeat any system for the improvement of their navigation provided by the general government. Legislation of the States, for the purposes and within the limits mentioned, does not infringe upon the commercial power of Congress." 102 U. S. 691, 699.

It follows, I think, from what has been said, that the position of the majority of the court, as to the paramount power of Congress over bridges crossing navigable streams, is not tenable. Congress cannot invade the rights of a State, nor can a State impede the exercise of the just powers of the Federal government. The conclusion I draw is, that a bridge constructed by the authority of a State, if it does not interfere with the free navigation of the stream, is a lawful structure, and can neither be taken nor destroyed by Congress or by the State, except as other private property may be thus taken, that is, for public purposes upon making just compensation.

It must also be borne in mind that the power to regulate

commerce with foreign nations and among the several States, extends to such commerce on land as well as to that on navigable waters. There are highways on land in every State, on which a far greater commerce, both inter-state and foreign, is conducted, than that which is borne upon its navigable waters. Congress can require that this commerce shall be as free from unnecessary obstruction as that on navigable waters connecting two or more States or leading to the sea. There is nothing in the Constitution which in any respect distinguishes the regulation it may exercise in either case. Its power, in all its extent and with all its limitations, is the same in both. The fact that navigable waters are natural highways, and roads, railways, and canals are of artificial construction, does not affect the power. That is, one of regulation of inter-state and foreign commerce by whatever channels conducted. If bridges crossing natural highways cannot be constructed without the consent of Congress, because it is vested with the power to regulate commerce with foreign nations and among the States, for like reason bridges cannot be constructed without such consent over artificial highways on land. The argument for the necessity of the consent in the one case is equally good in the other, and is equally unsound in both. In nearly every county of every State, bridges have been constructed under State authority over railways, — the great highways of commerce in modern times, — and it has never been suggested that the consent of Congress to their construction was at all necessary.

Nor do I find in the previous decisions of this court any recognition of a power in Congress to authorize the construction of bridges over navigable streams within or bordering on the States, in the sense that its permission will justify their construction, and that without it such construction would be unlawful, — excepting, of course, bridges which are parts of works undertaken for national purposes, — or of a power to regulate them, that is, to control them, after they are constructed. There are expressions in the opinions of the judges in the *Wheeling Bridge Case*, in the 18th of Howard, that, under the power to regulate commerce, Congress may declare what shall and shall not be deemed in judgment of law an obstruction to navigation. But these expressions, in their

generality, were not called for by the case before the court. That only called for a determination of the question whether a structure adjudged by the court to be unlawful as an obstruction to the navigation of the river could afterwards be legalized by Congress. The court held that it could be legalized, which amounted to no more than declaring that it should not thereafter be treated as interfering with the public right of navigation of the river, so far as that right was under the protection of Congress. This is a very different thing from asserting a power to declare that a structure, lawful when erected, and in no way interfering with the navigation of the river, is an unlawful structure, removable without compensation to the owner. I cannot admit that there is any such arbitrary power under our government. I find no warrant for it in the Constitution; on the contrary, all the guarantees which that instrument contains for the security of property negative its existence. Yet out of this assertion of a power to legalize a structure, which without such sanction would be deemed an obstruction to navigation, has grown up the doctrine of an independent power in Congress to authorize the construction of bridges over navigable streams without the permission of the States, and to control them when constructed. In this we are furnished with a striking illustration of the facility with which power is assumed from expressions, loosely or inadvertently used, apparently recognizing its existence. From the use of the word "assent" to the erection of a bridge over a navigable river, or the declaring of one already erected a lawful structure, the transition has been easy and natural to the assumption of an affirmative power in Congress to authorize, independently of the action of the States, the construction of such bridges, and to control them. From the authorities cited, and the reasons assigned, it is evident that Congress possesses no such power. In the *Wheeling Bridge Case*, Mr. Justice Nelson, who delivered the prevailing opinion said: "The bridge had been constructed under an act of the legislature of the State of Virginia; and it was admitted that act conferred full authority upon the defendants for the erection, subject only to the power of Congress in the regulation of commerce." 18 How. 430. Mr. Justice McLean, while dis-

senting from the asserted power of Congress to declare a bridge to be a lawful structure, which had been adjudged by the court to be a public nuisance as an obstruction to navigation, spoke with emphasis against the existence of any authority in Congress to construct bridges, and, of course, to authorize their construction, and his views do not appear to have met with any dissent from the other judges. "If," said he, "under the commercial power, Congress may make bridges over navigable waters, it would be difficult to find any limitation of such a power. Turnpike-roads, railroads, and canals might on the same principle be built by Congress. And if this be a constitutional power, it cannot be restricted or interfered with by any State regulation. So extravagant and absorbing a Federal power as this has rarely, if ever, been claimed by any one. It would, in a great degree, supersede the State governments by the tremendous authority and patronage it would exercise. But if the power be found in the Constitution, no principle is perceived by which it can be practically restricted. This dilemma leads us to the conclusion that it is not a constitutional power."

Such, also, has been the uniform doctrine of the Supreme Courts of several States declared by judges, some of whom were justly distinguished for their learning and ability. Thus, in *The People* v. *Rensselaer & Saratoga Railroad Co.*, in the Supreme Court of New York, Chief Justice Savage, in delivering its opinion, said: "I think I may safely say that a power exists somewhere to erect bridges over waters which are navigable, if the wants of society require them, provided such bridges do not essentially injure the navigation of the waters which they cross. Such power certainly did exist in the State legislatures, before the delegation of power to the Federal government by the Federal Constitution. It is not pretended that such a power has been delegated to the general government, or is conveyed under the power to regulate commerce and navigation; it remains, then, in the State legislatures, or it exists nowhere. It does exist, because it has not been surrendered any farther than such surrender may be qualifiedly implied; that is, the power to erect bridges over navigable streams must be considered so far surrendered as may be neces-

sary for a free navigation upon those streams." 15 Wend.
(N. Y.) 113, 131.

If weight is to be given to these authorities, and to the
reasons on which they rest, it must follow that the sovereignty
and jurisdiction of the States over their navigable waters,
which were as absolute upon the adoption of the Constitution
as over their roads, still continue; except that they are to be
so exercised as not to obstruct the free navigation of the
waters, — so far as such navigation may be required in the
prosecution of inter-state and foreign commerce. And by
" free navigation " is not meant a navigation entirely clear of
obstructions. In the sense in which these terms are used by
European jurists, the navigation of a river is free, when it is
not entirely interrupted, and not embarrassed by oppressive
duties exacted by riparian States. In this country, the navi-
gation of a river is deemed to be free, when it is kept open for
vessels cleared of such physical obstructions as would retard
their passage beyond what is required for the necessary transit
over the stream, and is exempt from exactions and delays other
than for the enforcement of quarantine and health laws; and
such occasional tolls as may be levied to meet the expenses of
improving its navigation. The delays attendant upon the
necessary transit of persons and property, or the enforcement
of quarantine and health laws, or the exaction in exceptional
cases of tolls, are not deemed to be inconsistent with the free
navigation of the river in the legal sense of those terms.
Thus, bridges with draws of sufficient width for the passage
of vessels are allowed on rivers in Europe, like the Rhine,
whose navigation is declared to be free. So, in this country,
such bridges do not destroy the free character of the naviga-
tion, any more than ferries, though, like them, they may cause
more or less delay to vessels. In *Palmer* v. *Commissioners of
Cuyahoga County*, application was made to the Circuit Court
of the United States, sitting in Ohio, for an injunction to pre-
vent the construction of a drawbridge over the Cuyahoga
River, on the ground that it would obstruct the navigation of
the river and injure the property of the plaintiff in its vicinity.
It was founded upon the fourth article of the ordinance of
1787 respecting the Northwestern Territory, which declares

" that the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of said Territory, as to the citizens of the United States, and those of any other States that may be admitted into the Confederacy, without any tax, impost, or duty therefor." The court, refusing the injunction, said that this provision " does not prevent a State from improving the navigableness of these waters, by removing obstructions, or by dams and locks so increasing the depth of the water as to extend the line of navigation. Nor does the ordinance prohibit the construction of any work on the river, which the State may consider important to commercial intercourse. A dam may be thrown over the river, provided a lock is so constructed as to permit boats to pass, with little or no delay, and without charge. A temporary delay, such as passing a lock, could not be considered as an obstruction prohibited by the ordinance." And again : " A drawbridge across a navigable water is not an obstruction. As this could not be a work connected with the navigation of the river, no toll, it is supposed, could be charged for the passage of boats. But the obstruction would be only momentary, to raise the draw; and as such a work may be very important in a general intercourse of the community, no doubt is entertained as to the power of the State to make the bridge."

In the *Wheeling Bridge Case*, the bridge was held to be an unlawful obstruction because it entirely prevented the passage of steam vessels with high chimneys; and the court ordered that it should be elevated in a manner, and to an extent indicated, so as to afford a free passage for the steamers; or that some other plan should be adopted by a day designated which would relieve the navigation from obstruction. Upon a suggestion that the obstruction to the navigation might be avoided by making a draw in the bridge, or in some other manner equally convenient to the public and less expensive than by elevating it, the matter was referred to an engineer; and upon his report the company was allowed to make an attempt to obviate the obstruction by improving another channel of the river and constructing a draw in the bridge over it. Some

slight delay would be caused by the draw, and an increased dis-
tance would have to be run in passing the new channel; but
the court did not consider these circumstances as constituting
a material objection to the plan. See also Cooley, Const. Lim.,
pp. 591–594, and authorities there cited.

The considerations to which I have referred and the authori-
ties cited lead to a ready solution of the questions raised by the
case at bar.

The construction of a bridge over the Ohio River was au-
thorized by the legislation of Kentucky and Ohio. The legis-
lation of Kentucky, adopted in 1868, provided that the bridge
" should be so constructed as not to obstruct the navigation of
the Ohio River further than the laws of the United States
authorize." The legislation of Ohio, adopted the same year,
authorized the construction of a bridge " either with a single
span or with a draw," as the company (incorporated for that
purpose) might determine; but in either case, in order that
said bridge might not obstruct the navigation of said river, the
same should be built in accordance with the act of Congress of
July 14, 1862, or of any act that Congress might thereafter pass
on the subject; which, of course, meant before the bridge was
built. The only regulation of Congress to which the erection
of the bridge was made subject by the States, was such as had
been prescribed or might be prescribed previously to the execu-
tion of the work. The bridge was not surrendered to any fur-
ther disposition or control of the general government. The
companies organized under the laws of the two States for the
construction of the bridge were authorized to consolidate them-
selves into one company. They were consolidated under the
name of the Newport and Cincinnati Bridge Company.

On the 3d of March, 1869, Congress passed a resolution
giving its consent to this company to erect a bridge over the
Ohio River from Cincinnati to Newport, provided it be built
with an unbroken or continuous span of not less than four hun-
dred feet in the clear from pier to pier, over the main channel
of the river, and in all other respects in accordance with the
conditions and limitations of an act entitled " An Act to estab-
lish certain post-roads," approved July 14, 1862; and the reso-
lution declared that the bridge, when completed in the manner

specified, should "be deemed and taken to be a legal structure," and should be "a post-road for the transmission of the mails of the United States." It also had this clause: "*But Congress reserves the right to withdraw the assent hereby given, in case the free navigation of said river shall at any time be substantially and materially obstructed by any bridge to be erected under the authority of this resolution, or to direct the necessary modifications and alterations of said bridge.*"

The act of July 14, 1862, provided that any bridge erected under it might, at the option of the company building the same, be constructed either as a drawbridge with a, pivot, or other form of draw; or with unbroken or continuous spans; and specified the width of the spans and the elevation of the bridge.

In March, 1869, the company commenced the construction of a bridge across the river according to a plan, which met all the conditions imposed by the legislation of the States and of Congress, and the work was prosecuted until March, 1871, when it was nearly completed, the actual cost then incurred being about $807,000. The whole cost, when completed at contract prices, would have been about $1,110,000. On the 3d of March of that year, while the company was in the prosecution of the work, Congress passed an act declaring that it would be unlawful for the company or any other person to proceed with the erection of the bridge without making various alterations, including a wider span and a higher elevation, which should be submitted to the Secretary of War for his approval.

The company immediately suspended work, adopted a new plan, submitted it to the Secretary of War, obtained his approval, and then proceeded with the bridge and completed it. The additional work, and the necessary changes in that already done, required by the act of Congress, caused an additional expenditure of over $300,000. The act also provided that, in the event the company made the changes, it should be lawful for it to file a bill in equity against the United States, in the Circuit Court for the Southern District of Ohio, which should have jurisdiction to determine, *first*, whether the bridge, according to the plans on which it had progressed at the passage of the act, had been constructed so as substantially to comply

with the provisions of law relating thereto; and, *second*, the liability of the United States, if any there were, to the company, by reason of the changes required; and if the court should determine that the United States were so liable, and that the bridge was so being built, then the court should further ascertain and determine the amount of the actual and necessary cost and expenditures reasonably required to be incurred in making the changes in the bridge and its approaches, in excess of the cost of building the bridge and approaches according to the original plan. The court was further authorized and required to proceed therein to final decree as in other cases in equity.

Under this act the present bill was filed, and it was clearly shown at the hearing that when the act was passed the bridge had been constructed substantially in compliance with all the provisions of law in relation thereto; that so far as constructed it did not materially obstruct the navigation of the river, and would not have done so had it been completed according to the original plan. Yet the court below held, and this court sustains its ruling, that for the enormous expenditures forced upon the company the United States are in no way responsible. This court thus, in effect, decides that the power of Congress over all structures crossing navigable streams is absolute; and that it can change or remove them at its pleasure, without regard to their effect upon the free navigation of the streams, and without compensation to the owners.

I do not think that the assent of Congress to the erection of the bridge was at all essential to its character as a lawful structure. That depended upon the legislation of Kentucky and Ohio, and upon the contingency of the bridge not interfering with the free navigation of the river. The assent of Congress, as already stated, only removed all ground of complaint of the structure as interfering with the public right of navigation, so far as that right was under the protection of the Federal government. No one could afterwards complain that the bridge, if built in conformity with the directions specified, constituted a public nuisance, because interrupting the free navigation of the river as secured under the laws of Congress, and proceed to obtain its abatement. The authority of the States

to build it, coupled with the assent of Congress, if constructed in the manner prescribed, placed the work, whilst in the process of erection and when completed, beyond the reach of legal proceedings for its abatement or modification. It could not, when completed, be taken for public purposes by the general government, nor be materially changed in its form and structure whilst in the process of erection, under compulsion of the legislation of Congress, without compensation to its owners. The legislative declaration, made when it was nearly completed, that its further construction would be unlawful without a change of plan, which necessitated very costly alterations, or an abandonment of the bridge, was a taking from its owners of a portion of their work as effectually as its absolute appropriation. If not, in the strict constitutional sense, a taking of private property for public uses, it was an enforced expenditure of labor and materials by the company, not required by the work undertaken or the conditions on which assent to its construction had been given; and for such labor and materials the government should, on every principle of justice, indemnify the company. A legislative decree commanding such an expenditure is within the spirit, if not the letter, of the constitutional provisions which inhibit depriving one of his property without due process of law, and taking it from him without compensation. The wrong inflicted is as great in the one way as in the other. As the provisions were designed to secure the individual from the arbitrary spoliation of his property, their purpose could be readily evaded if a special act could exact for the protection of his property an expenditure of money or labor, which was neither exacted when the property was acquired, nor permitted by the terms of its acquisition.

This view was taken by the Court of Appeals of Virginia, in *Crenshaw* v. *Slate River Company*, reported in 6th Randolph. There it was held that after a mill had been established and a dam erected according to a law granting to the mill-owner the use of the water for grinding, a subsequent act of the legislature, which imposed on him the burden of erecting locks through his dam, keeping them in repair, and giving them attendance so as to admit the passage of boats, and on his failure, vested in a company the power to abate the dam as

a nuisance, without full indemnification and equivalent for the injury thus done to his vested rights, was contrary to the Constitution of the State, and void, as a taking of private property for a public use without compensation.

There are many ways of taking property other than by occupation or appropriation, which are within the constitutional inhibition. If its beneficial use and enjoyment are prevented under the sanction of law, it is taken from him as effectually as though the title were condemned. Such is the purport of the decision in *Pumpelly* v. *Green Bay Company* (13 Wall. 166), a decision which has attracted much attention from its enlarged views of the redress afforded by the constitutional provision for injuries to property effected under authority of law, which permanently and materially impair its value. It was there held that the backing of the water of a river in Wisconsin by a dam authorized by law, so as to overflow the land of an individual, thus destroying its usefulness to him, was a taking of the property within the meaning of the Constitution. Mr. Justice Miller, in delivering the opinion of the court, very justly observed that " it would be a very curious and unsatisfactory result, if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators, as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public, it can destroy its value entirely, can inflict irreparable and permanent injury to an extent, — can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not *taken* for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right under the pretext of the public good, which had no warrant in the laws or practices of our ancestors."

It is not necessary, however, in order to charge the government with the expenditures forced upon the company, to rely upon this provision of the Constitution, further than to show the general spirit which should control the government in its legislation affecting the property of individuals.   There is a general principle of justice pervading our laws, and the laws of all free governments, which requires that whoever unlawfully and wrongfully imposes upon another the necessity of an unusual expenditure of money or labor or materials for the protection and preservation of his property, shall make complete indemnity for the expenditure.   The principle applies as fully to the acts of the government as to those of individuals; and wherever suits can be brought in the tribunals of the country, such indemnity can be enforced.   Here the government waives exemption from suit which its sovereign character gives, and submits the question of its liability to the judgment of its tribunals, thus admitting a readiness to indemnify the owners of the bridge, if it has disregarded its pledge and dealt unfairly with them in the premises.

The resolution of Congress giving its consent to the erection of the bridge specified its character and form, and the right to withdraw the consent or to direct necessary modifications and alterations of the bridge was reserved to be exercised only in case the free navigation of the river should at any time be substantially and materially obstructed by the bridge.   The reservation clause is to be read as though written thus: "But Congress reserves the right to withdraw the assent hereby given [or to direct the necessary modifications and alterations of said bridge] in case the free navigation of said river shall at any time be substantially and materially obstructed by any bridge to be erected under the authority of this resolution."   The right to withdraw the assent or to direct alterations was thus made to depend upon the same contingency; and the resolution amounts to a pledge of the government, that neither should be done unless the contingency happened.   Congress said to the constructing company in substance thus: "You are empowered by the States of Kentucky and Ohio to build a bridge over the Ohio River, of certain height and dimensions, provided it be so constructed as not to obstruct the navigation

of the river further than the present laws of the United States authorize, and in accordance with the act of July 14, 1862. Now, we consent to the erection of the bridge, that is, we declare that, if constructed in the manner prescribed, it shall not be deemed an obstruction to the free navigation of the river; but we reserve the right to withdraw this assent, or to direct alterations to the bridge, if hereafter the free navigation of the river should be substantially and materially obstructed by it."

The general government, through Congress, thus bound itself not to interfere with the construction of the bridge, nor with the bridge when completed, except on the contingency of its proving a material obstruction to the free navigation of the river. Such contingency had not occurred when the act directing the alterations was passed; it has never occurred. So the proofs in the case show, and independently of this circumstance, whether or not the contingency had occurred, was not a fact to be arbitrarily determined by the legislature. It was to be ascertained judicially upon proofs and after hearing the parties, like any other disputed fact upon the establishment of which rights of property depend. This doctrine, as well as other positions advanced in this opinion, is well illustrated by the case of *Commonwealth* v. *The Proprietors of New Bedford Bridge*, 2 Gray (Mass.), 339. There the act chartering the corporation authorized the building over a navigable stream in Massachusetts of a toll-bridge with two suitable draws, which were to be at least thirty feet wide, — one on the west side of the river in the channel way, and the other on the east side in the most suitable place there. A bridge with such draws was accordingly built. A subsequent act of the legislature required the corporation to make and maintain, in lieu of one of these two draws, a new draw of not less than sixty feet in width, — the westerly abutment of which was to be eight feet further to the eastward than the westerly abutment of the existing draw. The bridge proprietors, not making the changes required, were indicted for obstructing the navigation of the river by their bridge. They justified under their act of incorporation. In deciding upon their liability the court held that the original act of incorporation, when accepted, consti-

-tuted a contract between them and the State, by the terms of which both parties were equally bound; that the proprietors could not, without the consent of the legislature, escape or evade any of the duties or obligations imposed upon or assumed by them under the act; nor could the legislature, without the assent of the proprietors, in any way affect or impair the original terms of the charter by annexing new conditions or imposing additional duties onerous in their nature or inconsistent with a reasonable construction of the contract; that by its terms the proprietors were to erect "suitable draws, which were to be not less than thirty feet wide;" and that the question whether the draws already made were suitable, that is, constructed so as not unreasonably or unnecessarily to obstruct or impede the navigation of the river, was not a question to be determined absolutely by the legislature or by the proprietors, when disputed between the parties. "Like all other matters involving a controversy concerning public duty and private rights," said the court, "it is to be adjudged and settled in the regular tribunals where questions of law and fact are adjudicated on fixed and established principles, and according to the forms and usages best adapted to secure the impartial administration of justice." The same doctrine is also well illustrated in the case of *Mayor of Baltimore* v. *Connellsville & Pittsburg Railroad Co.*, decided in the Circuit Court of the United States by the late Mr. Justice Grier. The charter of the Pittsburg and Connellsville Railroad Company, a corporation of Pennsylvania, contained the following provision, viz.: "If the said company shall at any time misuse or abuse any of the privileges herein granted, the legislature may resume all and singular the rights and privileges hereby granted to such corporation." Under this clause the legislature passed an act, in 1864, revoking and resuming all the rights and privileges granted to the company, so far as it authorized the construction of a line southwardly or eastwardly from Connellsville. But the court held that when the right to revoke was to be exercised only in case the corporation should misuse or abuse its privileges, the fact of such misuse, if denied by the corporation, should be established by competent proceedings; and that an act declaring a revocation without the establishment of such fact was unconsti-

tutional. In giving its opinion Mr. Justice Grier said: "If in the act of incorporation the legislature retains the absolute and unconditional power of revocation for any or no reason; if it be so written in the bond, the party accepting a franchise on such conditions cannot complain if it be arbitrarily revoked; or if this contract be that the legislature may repeal the act whenever in its opinion the corporation has misused or abused its privileges, then the contract constitutes the legislature the arbiter and judge of the existence of that fact. But the case before us comes within another category. The contract does not give an unconditional right to the legislature to repudiate its contract, nor is the legislature constituted the tribunal to adjudge the question of fact as to the misuse or abuse." 4 Am. Law Reg. N. s. 750.

A consciousness seems to have pervaded Congress that it was disregarding its pledge to the company, when it directed the alterations which proved so expensive, before the contingency mentioned had happened; and that it might turn out that the bridge completed as designed would not substantially and materially obstruct the free navigation of the river; and that, in that case, it would be justly chargeable with the commission of an injury to the company. For this reason, I think we may assume it intended that the court should award compensation to the owners for the alterations made, if, upon proof, it appeared that, so far as the bridge had been constructed, when they were required, the provisions of the law relating thereto had been substantially complied with; and it should also appear that, if completed as originally designed, the bridge would not have substantially and materially obstructed the free navigation of the river. Congress did not intend that heavy expenditures should be imposed by its will upon the company without at the same time offering, if they were illegally exacted, to reimburse them. Congress intended to be just, and I cannot resist the conclusion, that the court, in its decision, has defeated its intentions.

MR. JUSTICE BRADLEY. I dissent from the judgment of the court in this case, and will briefly state my reasons. The central reason is, that the bridge, as it stood, nearly completed when the

act of March 3, 1871, c. 121, directing it to be taken down or altered, was passed, was a lawful structure, and in the lawful possession of the appellants as their private property; and, being such, I think that Congress could not constitutionally require its demolition, or reconstruction, without providing for compensation to the owners. By virtue of its plenary power to regulate commerce among the several States, as well as with foreign nations, Congress may undoubtedly require the removal of all nuisances and unlawful obstructions in the navigable rivers of the United States, without giving compensation to any persons who may be incidentally affected. It also has the power to improve the navigation of such rivers; but in making or authorizing improvements, other than the removal of unlawful obstructions, it cannot take private property without complying with that clause of the Fifth Amendment to the Constitution which declares, "Nor shall private property be taken for public use without just compensation." This proposition would be conceded where property taken for that purpose consists of lands, houses, buildings, or other structures standing on the natural banks of a river; but I think that it is equally true where erections are made on the margin of a river, or where a bridge is constructed across it, in accordance with the laws of the State and with the consent of Congress. Such structures are lawful and are private property, entitled to the constitutional protection. That which is lawful is not a nuisance, and cannot be prostrated or removed as such without compensation.

I should not have much difficulty in holding, if it were necessary to the decision of the case, that such structures made in conformity with the laws of the State, if not prohibited by any act of Congress, and not materially interfering with navigation, would be equally lawful, and entitled to the protection of the Constitution. There is a vast amount of property of this sort in this country. The wharves which have been extended below low-water mark, the flats covered by shallow water which have been reclaimed, and the many bridges which have been erected over navigable streams, are nearly all of this class. Navigation has rarely been materially interfered with in these works, the States themselves being deeply interested

in preserving it free from obstruction.  It would be strange if Congress could destroy this species of property without any compensation whatever.

But the bridge in question had not only the sanction of the States of Kentucky and Ohio, which it was intended to connect, but it had also the sanction of an act of Congress.  If that of the States was not sufficient to make it a lawful structure, that of Congress, in addition, certainly made it so.  I cannot yield to the argument that the reservation in the resolution of 1869 made the bridge any the less lawful than it would have been if no such reservation had been made.  After authorizing the bridge to be erected in the manner it was, the resolution went on to say " that the said bridge, when completed in the manner specified in this resolution, shall be deemed and taken to be a legal structure, and shall be a post-road for the transmission of the mails of the United States ; " then comes the reservation referred to, as follows : " But Congress reserves the right to withdraw the assent hereby given in case the free navigation of said river shall at any time be substantially and materially obstructed by any bridge to be erected under the authority of this resolution, or to direct the necessary modifications and alterations of said bridge."  The power thus reserved was merely declaratory of the power which Congress would have had without reserving it; but there is no stipulation or condition that it might be exercised without providing for compensation to the proprietors of the bridge ; and inasmuch as the bridge became a lawful structure, — was, in fact, expressly declared such by the resolution of 1869, — it cannot be presumed that this reserved power was to be exercised in any other than the constitutional mode.  Hence, when the act of 1871 required the bridge to be taken down, and constructed on a different plan, if constructed at all, we should expect what we find was done, that provision would be made in the same law for ascertaining the damages to which the appellants would be put by the alteration, and for the payment thereof out of the treasury of the United States.  It is true that the law required the tribunal to which the matter was referred to ascertain the liability of the United States, " if any there be ; " thus qualifying the provision for compensation by a prelimi-

nary inquiry as to the government's liability. This inquiry was probably directed to be made from the fact that doubts may have existed in the minds of some members of the legislative body whether the reservation referred to did not exonerate the United States from any obligation to make compensation. In my opinion it did not. I think, therefore, that the appellant was entitled to a decree in its favor, and that the decree of the Circuit Court dismissing the bill should be reversed.