## MILLER et al. v. CITY OF GREENVILLE, MISS., et al.

### CHICOT COUNTY et al. v. SAME.
### Nos. 12535, 12536.

Circuit Court of Appeals, Eighth Circuit.

Nov. 4, 1943.

714

George Vaughan and J. F. Koone, both of Little Rock, Ark. (Guy E. Williams, of Little Rock, Ark., on the brief), for appellants Charles G. Miller, and others.

Lee Cazort, Jr., of Little Rock, Ark. (John Baxter, of Dermott, Ark., on the brief), for appellants Chicot County and others.

William C. Keady, of Greenville, Miss., and O. C. Burnside, of Lake Village, Ark. (W. T. Wynn, H. P. Farish, and Sam C. Cook, all of Greenville, Miss., on the brief), for appellees.

Before WOODROUGH, THOMAS, and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

Statement: The City of Greenville, a municipal corporation in Mississippi, and the Union Planters National Bank & Trust Co., a national bank in Tennessee, as trustee under trust indenture, brought this action in the district court against the Arkansas Corporation Commission and its individual members, and against tax officials of Chicot County, Arkansas, for declaratory judgment to the effect that the portion of a bridge over the Mississippi river within the state of Arkansas, and owned by the City of Greenville, is exempt from taxation under the state's authority, and judgment for plaintiffs was entered as prayed.

It appears that United States Highway No. 82, after passing through the state of Texas, traverses the state of Arkansas until it reaches the Mississippi river at a point opposite the city of Greenville, Mississippi. Prior to the construction of the bridge in question a ferry, privately owned, linked the gap between the highway where it stopped on the Arkansas side of the river and where it again continued in the state of Mississippi, then ran into the state of Alabama and to the east. Under the Act of Congress, approved June 14, 1938, 52 Stat. 681, the city of Greenville was empowered to construct, maintain and operate a bridge across the river to fill the gap, and was authorized to acquire real estate and

other property needed for the location, construction, maintenance and operation of the bridge and its approaches. The city was authorized to fix toll charges on the bridge on the condition that the tolls were adjusted so as to create revenue sufficient only to cover maintenance, repair and operating expenses and a sinking fund for the amortization of bonds whose proceeds were applied on the cost of the bridge, including interest. After providing a sinking fund sufficient for amortization, the bridge was to be operated and maintained free of tolls.

Under authority of the Act of Congress and supplementary authority of the state of Mississippi, G. L. Miss., 1938, Ch. 283, the city acquired lands and right of way easements for the purpose of constructing the bridge and its approaches, and began its construction work in December, 1938, completing the bridge in the fall of 1940.

The total cost of the bridge and its approaches was approximately four million dollars. The states of Arkansas and Mississippi covered the cost of making the preliminary survey and investigation with a contribution of about $6,000. The United States Government contributed $2,100,150 under the provisions of Title II of the National Industrial Recovery Act, Section 201, et seq., 40 U.S.C.A. § 401, et seq., and the state of Mississippi contributed about $345,000. Bridge revenue bonds in the sum of $2,181,000 were sold by the city to the Reconstruction Finance Corporation, the major part of the proceeds being used to pay for the construction of the bridge. To secure repayment of the principal and interest on the bonds, the city executed and delivered a trust indenture to the plaintiff trust company in which it pledged the tolls to be charged for the use of the bridge. As of March 1, 1941, the city executed refunding bonds in the principal amount of $2,181,000 and exchanged them for the bonds issued and sold to the Reconstruction Finance Corporation. Another trust indenture was executed and delivered to plaintiff trustee to secure payment of principal and interest on these bonds. The trust indenture contained substantially the same provisions as the first with respect to security. Each of the trust indentures provided for the adjusting of the tolls so as to comply with the provisions of the statute, i.e., the tolls charged were to provide a fund sufficient only to pay the cost of maintaining, repairing and operating the bridge and its approaches, and to provide a sinking fund for the discharge of the principal amount of the bonds and interest thereon at 4 per cent, as soon as possible, but not to exceed forty years from September 1, 1940. In the opinion of the trial court, the city has no financial obligation with respect to the payment of the bonds or interest thereon under the terms and provisions of the trust indenture and bonds, "but the bondholders are wholly dependent upon the collection of tolls for the repayment of principal and interest of the bonds."

In October, 1941, defendant county officials of Chicot county notified the city of their intention to cause an assessment for taxation to be made upon the assessment rolls of Chicot county, Arkansas, with respect to the portion of the bridge which they claimed lay within the state of Arkansas, for the years 1941 and 1942. In January, 1942, the defendant commissioners of the Arkansas Corporation Commission likewise notified the city of their intention to return for assessment for 1941 and 1942 the portion of the bridge which they claimed lay in the state of Arkansas.

Plaintiffs' amended and substituted complaint set out the above facts and pleaded that the portion of the bridge lying within the state of Arkansas was not subject to assessment for taxation under that state's authority on the following grounds:

(a) That the city under the Act of Congress had been designated as an agency of the United States and was acting as such in owning and operating the bridge;

(b) That Congress intended that the bridge should be tax exempt;

(c) That under the Constitution of the United States the several states are exempt from taxation by each other and that in owning and operating the bridge the city performed essential governmental functions of the state of Mississippi, and under the state laws was invested with the state's constitutional immunity;

(d) That the portion of the bridge lying within the state of Arkansas was public property, used exclusively for public purposes and, therefore, exempt from taxation under Article 16, section 5, of the Constitution of Arkansas;

(e) That the denial of exemption by defendants was a denial to the city of the

equal protection of the laws of Arkansas guaranteed by the 14th amendment to the Constitution of the United States;

(f) That the assessments would impair a contract between the state of Arkansas as one party and the city and bondholders as the other party, arising under Article 16, section 5 of the Arkansas Constitution, to grant and maintain the tax exemption, and that the impairment of the contract would violate section 10, article 1, of the Constitution of the United States;

(g) That the taxation in question would result in an undue burden on interstate commerce.

The county officials filed a motion to dismiss upon the grounds that the district court had no jurisdiction over the subject matter or over the county officials, and that the complaint failed to state a claim or cause of action upon which relief could be granted.

The commissioners filed a motion to dismiss, and a separate answer, the latter consisting of a general denial, and specific denials of the allegations of the complaint. Their motion to dismiss presented grounds therefor as follows: "(1) because plaintiffs have a plain, adequate and speedy remedy in a Chancery Court of the State by way of injunction, and (2) because plaintiffs have a plain, adequate and speedy remedy by way of a hearing before the Corporation Commission, appeal to the Circuit Court, advancement of the case in said Court, appeal from the Circuit Court and the advancement of the case in the Supreme Court and appeal from the Supreme Court."

At a hearing on the motions to dismiss, it was stipulated that in the event the court should overrule the county officials' motion to dismiss, they would refuse to plead further and the court might prepare a final order as to them. Plaintiffs then made the following motion: "On behalf of the plaintiffs we move for judgment on the pleadings, as they now stand, it being agreeable to the County Officials and to the Corporation Commission that such motion be made at this time in order to raise the issues of law for the final determination by this Court." Decision as stated was for plaintiffs.

Opinion: We direct our inquiry first to the grounds upon which the plaintiffs assert federal equity jurisdiction to render the declaratory judgment prayed for: (1)

That there is a controversy arising under the Constitution and laws of the United States; (2) that diversity of citizenship exists and the bridge property is exempted from taxation by Article 16, Section 5 of the Arkansas constitution; (3) that declaratory judgment by the federal equity court affords appropriate remedy.

■ (1) Diversity of citizenship and sufficiency of amount involved are established, but we do not find that the case presents a controversy arising under the Constitution or laws of the United States The contract of the holders of the bonds secured by the bridge tolls was entered into in the light of the Act of June 14, 1938, providing for the construction of the bridge, and Article 16, Section 5 of the Arkansas Constitution, and if neither the act nor the constitutional provision provides exemption of the bridge property in Arkansas from taxation under the state's authority, then such taxation would in no wise impair the obligation of the contract. Examination of the act satisfies us that Congress did not in any of the provisions manifest any intention that the bridge should be exempt from taxation.

The first portion of the act declares that it was enacted in order "to promote interstate commerce, improve the Postal Service, and provide for military and other purposes." Section 2 confers upon the city of Greenville "all such rights and powers to enter upon lands and to acquire, condemn, occupy, possess, and use real estate and other property needed for the location, construction, maintenance, and operation of such bridge and its approaches as are possessed by railroad corporations for railroad purposes or by bridge corporations for bridge purposes in the State in which such real estate or other property is situated." Section 3 authorizes the city to fix and charge tolls for transit over the bridge. Section 4 provides that the rates of tolls should be adjusted so as to provide revenue sufficient only to pay the cost of maintaining, repairing and operating the bridge and to provide a sinking fund for the amortization of the cost, and that after a sinking fund sufficient for the amortization is provided, the bridge should thereafter be maintained and operated free of tolls.

No reference by Congress to exemption for taxation of the bridge is found in the act. The rights, powers and duties of the city were specifically set out, and it is

reasonable to assume that if Congress had intended to confer tax immunity in respect to the bridge, it would not have remained silent upon the matter. From the fact that Section 2 of the Act confers upon the city such rights and powers with respect to the possession and use of real estate as are possessed by railroad and bridge corporations in the state in which the real estate or other property is situated, it may be implied that no restriction upon the sovereign power to tax was intended.

Confirmation of such conclusion is seen in the course of related legislation. In 1936 the President vetoed a bill to exempt publicly-owned highway bridges from state, municipal and local taxation. In 1938 Congress authorized the construction of bridges across the Mississippi river between Iowa and Illinois at the city of Dubuque. The bill contained the following tax exemption provision: "The bridge or bridges purchased or constructed under the authority of the Act shall be deemed to be Federal instrumentalities for interstate commerce, the postal service, and military and other purposes authorized by the Government of the United States, and said bridge or bridges and the bonds issued in connection therewith and the income derived therefrom shall be exempt from all Federal, State, municipal and local taxation."

On June 25, 1938, two weeks after he had approved the Act of Congress authorizing the construction of the Greenville bridge, the President vetoed the act relating to the Dubuque bridges, giving the following explanation:

"Under date of June 30, 1936, I withheld my approval of S.3107, 74th Congress,—a bill to exempt publicly-owned interstate highway bridges from State, Municipal, and local taxation, for reasons stated in my press release of that date, as follows:

"'The effect of this bill would be that, by declaring publicly-owned interstate highway bridges to be Federal instrumentalities, such bridges would thereby be exempt from all State and local taxation. I cannot give my approval to this bill, first because I can find no compelling reason for making publicly-owned interstate highway bridges Federal instrumentalities, and secondly, because relieving such bridges of all State and local taxation would, in a majority of cases, result in loss of revenue by States and their politi-

cal subdivisions, necessitating material curtailment of necessary activities, or the imposition of increased tax burdens upon other taxpayers to make up the deficit.'

"For the same reasons and the added reason that the present bill, S 3892, would exempt Federal taxation in addition to State, municipal and local taxation, I cannot give the bill my approval."

It thus appears that when Congress intended an authorized bridge to be exempted from taxation, it expressed such intent specifically in the act. It omitted such expression from the act respecting the Greenville bridge and the act was passed contemporaneously with the act for the Dubuque bridges.

That the Greenville bridge could not have been constructed over the Mississippi river except for the authorization of Congress is not open to doubt, Bellaire, Benwood & Wheeling F. Co. v. Interstate Bridge Co., 4 Cir., 40 F.2d 323, certiorari denied, 282 U.S. 861, 51 S.Ct. 35, 75 L.Ed. 762; Miller v. New York, 109 U.S. 385, 3 S.Ct. 228, 27 L.Ed. 971; Newport, etc., Co. v. United States, 105 U.S. 470, 26 L. Ed. 1143; but it does not follow from the mere fact that Congress constitutionally authorized the erection and maintenance of the bridge that Congress created a federal instrumentality not subject to taxation. Henderson Bridge Co. v. Henderson City, 173 U.S. 592, 19 S.Ct. 553, 43 L.Ed. 823; City of Louisville v. Babb, 7 Cir., 75 F.2d 162, certiorari denied 295 U.S. 738, 55 S.Ct. 650, 79 L.Ed. 1686; People v. City of St. Louis, 291 Ill. 600, 126 N.E. 529; Appeal of City of Dubuque Bridge Comm., Iowa, 5 N.W.2d 334, certiorari denied City of Dubuque Bridge Comm. v. Board of Review for City of Dubuque, 317 U.S. 686, 63 S.Ct. 259, 87 L.Ed. ——. As pointed out by the Supreme Court in Henderson Bridge Co. v. Henderson City, supra, 173 U.S. at page 622, 19 S.Ct. at page 564, 43 L.Ed. 823: "Nor do we perceive that the power of Kentucky to tax this bridge structure as property is any the less by reason of the fact that it was erected in and over the Ohio river under the authority or with the consent of congress. The taxation of the bridge by Kentucky is in no proper sense inconsistent with the power of congress to regulate the use of the river as one of the navigable waters of the United States. This taxation does not interfere in any degree with the free use of

the river by the people of all the states, nor with any jurisdiction that the state of Indiana may properly exercise over that stream."

It is true that "when the national government lawfully acts through a corporation which it owns and controls, those activities are governmental functions entitled to whatever tax immunity attaches to those functions when carried on by the government itself through its departments," Graves v. New York ex rel. O'Keefe, 306 U.S. 466, 477, 59 S.Ct. 595, 597, 83 L.Ed. 927, 120 A.L.R. 1466, but the inapplicability of that principle to the facts of the instant case is obvious, for the bridge is not a structure owned or controlled by the ·government, nor do those in charge of it use or exercise the authority of the United States Government in their activities in connection with the bridge in such a way that they could be said to be acting for the government. Nor does the declaration of Congress that a purpose of the bridge was to improve the postal service give it such character as to interfere with the rights of the state to impose taxes. Henderson Bridge Co. v. Kentucky, 166 U.S. 150, 17 S.Ct. 532, 41 L.Ed. 953; Postal Telegraph Cable Co. v. Charleston, 153 U.S. 692, 14 S.Ct. 1094, 38 L.Ed. 871. Moreover, from the history of the contemporaneous legislation surrounding the authorization of such bridges, it is clear that Congress did not intend that the bridge should be deemed a federal instrumentality. In the first act passed by Congress authorizing the construction of the Dubuque bridges, Congress expressly stated that the bridges were deemed federal instrumentalities. After the veto of the first Dubuque bill a second Dubuque bill was approved in 1939, 53 Stat. 1051, containing no such expression. Such expression was omitted obviously with deliberate intent from the act in question here.

■ The contention that taxation of the bridge would constitute an undue burden on interstate commerce is likewise insufficient to raise a substantial federal question. A tax levied upon the bridge by the state of Arkansas would not be a tax upon interstate commerce. City of Louisvilſe v. Babb, supra; Henderson Bridge Co. v. Henderson City, supra; Henderson Bridge Co. v. Kentucky, supra. In Henderson Bridge Co. v. Kentucky, supra, it was pointed out that such a tax is not a tax on interstate commerce carried on by means of the bridge because the owners of the bridge did not transact the business; the business was carried on by the persons and corporations paying the tolls for the privilege of using the bridge. But although the bridge is property used in interstate commerce, taxation of property used in interstate commerce and having a situs within the taxing state affects interstate commerce only incidentally and is not inconsistent with the constitutional immunity against the imposition of direct burdens on interstate commerce. Commonwealth of Virginia v. Imperial Coal Co., 293 U.S. 15, 55 S.Ct. 12, 79 L.Ed. 171; Adams Express Co. v. Ohio State Auditor, 165 U.S. 194, 17 S.Ct. 305, 41 L.Ed. 683; Wells Fargo & Co. v. Nevada, 248 U.S. 165, 39 S.Ct. 62, 63 L.Ed. 190; Illinois Cent. R. Co. v. Minnesota, 309 U.S. 157, 60 S.Ct. 419, 84 L.Ed. 670, rehearing denied 309 U.S. 695, 60 S.Ct. 585, 84 L.Ed. 1035.

■ In order to confer jurisdiction on the ground of a federal question involved there must be a real and substantial dispute respecting the validity, construction and effect of laws, or the Constitution, of the United States, upon the determination of which the result of the suit depends. Shulthis v. McDougal, 225 U.S. 561, 569, 32 S.Ct. 704, 56 L.Ed. 1205. A claimed federal question obviously without merit is not substantial and will not support federal jurisdiction. Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152.

■ (2) The provision of the Arkansas Constitution relied on by the plaintiffs reads in relevant part: "The following property shall be exempt from taxation: Public property used exclusively for public purposes." They contend, and seek to obtain declaratory judgment, that the Greenville bridge is public property used exclusively for public purposes within the intendment of the provision. They argue that the Supreme Court of Arkansas has construed the constitutional provision and that as so construed it exempts the part of the bridge property which is situate in Arkansas. But our examination of the Arkansas decisions has not persuaded that any authoritative pronouncement has been made in the state courts determining the intent and meaning of the constitutional provision as it must be applied to the facts in this case. The cases in which the Supreme Court of Arkansas considered

and discussed the provision[1] did not involve facts similar to those presented here, and the prayer of plaintiffs' petition calls for an interpretation on first impression by the federal court in a controversial matter broadly affecting the sovereign power and public policy of the State of Arkansas. The only valid ground on which the exercise of the federal jurisdiction is invoked is the diversity of citizenship, and the occasion for unnecessary conflict which the issue presents is apparent. Aside from the fact that the object of the suit is to escape impending taxation, the nature of the dispute presents an instance of peculiar clarity where the federal court must, in the exercise of judicial discretion, refuse to take cognizance of the controversy and must relegate the parties to the courts of the state which have plenary power to interpret its Constitution. Green v. Phillips Petroleum Co., 8 Cir., 119 F.2d 466, 469; Thompson, Trustee v. Magnolia Petro. Co., 309 U.S. 478, 484, 60 S.Ct. 628, 84 L.Ed. 876; Railroad Commission v. Pullman Co., 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971; Chicago v. Fieldcrest Dairies, Inc., 316 U.S. 168, 172, 62 S.Ct. 986, 86 L.Ed. 1355; Commonwealth of Pennsylvania v. Williams, 294 U.S. 176, 185, 55 S.Ct. 380, 79 L.Ed. 841, 96 A.L.R. 1166; Beal v. Missouri Pac. R. Co., 312 U.S. 45, 50, 61 S. Ct. 418, 85 L.Ed. 577; Rogers v. Guaranty Trust Co., 288 U.S. 123, 130, 53 S.Ct. 295, 77 L.Ed. 652, 89 A.L.R. 720; Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424, decided May 24, 1943; Whisler v. West Plains, 8 Cir., 137 F.2d 938, decided Oct. 6, 1943; Great Lakes D. & D. Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407.

 (3) But the facts in this case do not justify maintenance of this action under the federal declaratory judgment statute. 28 U.S.C.A. § 400. The object of the suit is to avoid assessment and collection of state taxes and the same considerations upon which the federal courts of equity have declined, save in exceptional cases, to relieve against state taxes claimed to be unlawful, are controlling in suits under the declaratory judgment statute. Examination of the remedies provided by Arkansas law against illegal assessment or collection of taxes shows clearly that not only administrative but also court proceedings are made available to the taxpayer. Pope's Digest, Sections 2019, 2047, 2050, 2735, 2860, 13671, 13963; Crawford & Moses Digest, Section 10180; Dickinson, Receiver v. Housley, 130 Ark. 259, 197 S. W. 25; White River Lumber Co. v. Elliott, 146 Ark. 551, 226 S.W. 164; Kansas City So. Ry. v. Hooper, 174 Ark. 847, 298 S.W. 201. Such remedies are not inadequate and the action which the defendants propose to take to subject plaintiffs' property to assessment and taxation involves no deprivation of property without due process of law. There may be uncertainty as to whether the Corporation Commission or the county officers should make assessment of the bridge property if it is taxable, and also as to the proportion and value of the bridge property within and without the state. Doubtless some convenience might be served by settling all the problems of the attempt to tax the bridge property in Arkansas in one action in the federal court. But the assessment and levy of property tax is rarely free from some measure of burden and expense where disputes exist and it is not the function of the federal courts to interfere in such incidents of state tax administration. The last pronouncement of the Supreme Court in Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 1072, 87 L.Ed. 1407, handed down since the judgment herein, clearly defines the considerations which control the federal courts in an action for declaratory judgment such as is here presented. The questions which the court discussed and passed upon were not different in substance from those raised in this case, and the following quotation disposes of those deemed substantial:

"This Court has recognized that the federal courts, in the exercise of the sound discretion which has traditionally guided courts of equity in granting or withholding the extraordinary relief which they may afford, will not ordinarily restrain state officers from collecting state taxes where state law affords an adequate remedy to the taxpayer. Matthews v. Rodgers, 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447. This withholding of extraordinary relief by courts having authority to give it is not a denial of the jurisdiction which Congress has conferred on the federal courts, or of the settled rule that the measure of

---

[1] School Dist. of Ft. Smith v. Howe, 62 Ark. 481, 37 S.W. 717; Bonner v. Board of Directors of St. Francis Levee Dist., 77 Ark. 519, 92 S.W. 1124; Adkins v. Kalter, 171 Ark. 1111, 287 S.W. 388, 390.

inadequacy of the plaintiff's legal remedy is the legal remedy afforded by the federal not the state courts. Stratton v. St. Louis S. W. Ry. Co., 284 U.S. 530, 533, 534, 52 S.Ct. 222, 223, 76 L.Ed. 465; Di Giovanni v. Camden Ins. Ass'n, 296 U.S. 64, 69, 56 S.Ct. 1, 4, 80 L.Ed. 47. On the contrary, it is but a recognition that the jurisdiction conferred on the federal courts embraces suits in equity as well as at law, and that a federal court of equity, which may in an appropriate case refuse to give its special protection to private rights when the exercise of its jurisdiction would be prejudicial to the public interest (United States v. Dern, 289 U.S. 352, 359, 360, 53 S. Ct. 614, 617, 77 L.Ed. 1250; Virginian Ry. Co. v. System Federation, 300 U.S. 515, 549–553, 57 S.Ct. 592, 600, 602, 81 L.Ed. 789), should stay its hand in the public interest when it reasonably appears that private interests will not suffer. See Commonwealth of Pennsylvania v. Williams, 294 U.S. 176, 185, 55 S.Ct. 380, 385, 79 L.Ed. 841, 96 A.L.R. 1166, and cases cited.

"It is in the public interest that federal courts of equity should exercise their discretionary power to grant or withhold relief so as to avoid needless obstruction of the domestic policy of the states.

" 'The scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts, and a proper reluctance to interfere by injunction with their fiscal operations, require that such relief should be denied in every case where the asserted federal right may be preserved without it. Whenever the question has been presented, this Court has uniformly held that the mere illegality or unconstitutionality of a state or municipal tax is not in itself a ground for equitable relief in the courts of the United States. If the remedy at law is plain, adequate, and complete, the aggrieved party is left to that remedy in the state courts, from which the cause may be brought to this Court for review if any federal question be involved.' Matthews v. Rodgers, supra, 284 U.S. at pages 525, 526, 52 S.Ct. at pages 219, 220, 76 L.Ed. 447.

■ "Interference with state internal economy and administration is inseparable from assaults in the federal courts on the validity of state taxation, and necessarily attends injunctions, interlocutory or final, restraining collection of state taxes. These are the considerations of moment which have persuaded federal courts of

equity to deny relief to the taxpayer—especially where the state, acting within its constitutional authority, has set up its own adequate procedure for securing to the taxpayer the recovery of an illegally exacted tax.

"Congress recognized and gave sanction to this practice of federal equity courts by the Act of August 21, 1937, 50 Stat. 738, enacted as an amendment to Section 24 of the Judicial Code, 28 U.S.C. § 41(1), 28 U.S.C.A. § 41(1). This provides that 'no district court shall have jurisdiction of any suit to enjoin, suspend, or restrain the assessment, levy, or collection of any tax imposed by or pursuant to the laws of any State where a plain, speedy, and efficient remedy may be had at law or in equity in the courts of such state.' The earlier refusal of federal courts of equity to interfere with the collection of state taxes unless the threatened injury to the taxpayer is one for which the state courts afford no adequate remedy, and the confirmation of that practice by Congress, have an important bearing upon the appropriate use of the declaratory judgment procedure by the federal courts as a means of adjudicating the validity of state taxes.

"It is true that the Act of Congress speaks only of suits 'to enjoin, suspend, or restrain the assessment, levy, or collection of any tax' imposed by state law, and that the declaratory judgment procedure may be, and in this case was, used only to procure a determination of the rights of the parties, without an injunction or other coercive relief. It is also true that that procedure may in every practical sense operate to suspend collection of the state taxes until the litigation is ended. But we find it unnecessary to inquire whether the words of the statute may be so construed as to prohibit a declaration by federal courts concerning the invalidity of a state tax. For we are of the opinion that those considerations which have led federal courts of equity to refuse to enjoin the collection of state taxes, save in exceptional cases, require a like restraint in the use of the declaratory judgment procedure.

■ "The statutory authority to render declaratory judgments permits federal courts by a new form of procedure to exercise the jurisdiction to decide cases or controversies, both at law and in equity, which the Judiciary Acts had already conferred. Ætna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617.

108 A.L.R. 1000. Thus the Federal Declaratory Judgments Act (Act of June 14, 1934, 48 Stat. 955, as amended, 28 U.S.C. § 400, 28 U.S.C.A. § 400) provides in subdivision 1 that a declaration of rights may be awarded although no further relief be asked, and in subdivision 2 that 'further relief based on a declaratory judgment or decree may be granted whenever necessary or proper.'

"The jurisdiction of the district court in the present suit, praying an adjudication of rights in anticipation of their threatened infringement, is analogous to the equity jurisdiction in suits quia timet or for a decree quieting title. See Nashville, C. & St. L. Ry. Co. v. Wallace, 288 U.S. 249, 263, 53 S.Ct. 345, 348, 77 L.Ed. 730, 87 A.L.R. 1191. Called upon to adjudicate what is essentially an equitable cause of action, the district court was as free as in any other suit in equity to grant or withhold the relief prayed, upon equitable grounds. The Declaratory Judgments Act was not devised to deprive courts of their equity powers or of their freedom to withhold relief upon established equitable principles. It only provided a new form of procedure for the adjudication of rights in conformity to those principles. The Senate committee report on the bill pointed out that this Court could, in the exercise of its equity power, make rules governing the declaratory judgment procedure. S. Rep. No. 1005, 73d Cong., 2d Sess., p. 6. And the House report declared that 'large discretion is conferred upon the courts as to whether or not they will administer justice by this procedure.' H. R. Rep. No. 1264, 73d Cong., 2d Sess., p. 2; and see Brillhart v. Excess Ins. Co., 316 U.S. 491, 494, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620; Borchard, Declaratory Judgments (2d ed.) p. 312.

█ "The considerations which persuaded federal courts of equity not to grant relief against an allegedly unlawful state tax, and which led to the enactment of the Act of August 21, 1937, are persuasive that relief by way of declaratory judgment may likewise be withheld in the sound discretion of the court. With due regard for these considerations, it is the court's duty to withhold such relief when, as in the present case, it appears that the state legislature has provided that on payment of any challenged tax to the appropriate state officer, the taxpayer may maintain a suit to recover it back. In such a suit he may assert his federal rights and secure a review of them by this Court. This affords an adequate remedy to the taxpayer, and at the same time leaves undisturbed the state's administration of its taxes.

"The Act of August 21, 1937, was predicated upon the desirability of freeing, from interference by the federal courts, state procedures which authorize litigation challenging a tax only after the tax has been paid. See S. Rep. No. 1035, 75th Cong., 1st Sess.; H. R. Rep. No. 1503, 75th Cong., 1st Sess. Even though the statutory command be deemed restricted to prohibition of injunctions restraining collection of state taxes, its enactment is hardly an indication of disapproval of the policy of federal equity courts, or a mandatory withdrawal from them of their traditional power to decline jurisdiction in the exercise of their discretion.

█ "For like reasons, we think it plain also that the enactment of the Act of August 30, 1935, 49 Stat. 1027, 28 U.S.C. § 400(1), 28 U.S.C.A. § 400(1), which excluded from the operation of the Declaratory Judgments Act all cases involving federal taxes, cannot be taken to deprive the courts of their discretionary authority to withhold declaratory relief in other appropriate cases. This amendment was passed merely for the purpose of 'making it clear' that the Declaratory Judgments Act would not permit 'a radical departure from the long-continued policy of Congress' to require prompt payment of federal taxes. See S. Rep. No. 1240, 74th Cong., 1st Sess., p. 11; H. R. Rep. No. 1885, 74th Cong., 1st Sess., p. 13.

"The judgment of dismissal below must therefore be affirmed, but solely on the ground that, in the appropriate exercise of the court's discretion, relief by way of a declaratory judgment should have been denied without consideration of the merits."

We conclude upon the same reasoning that the judgment appealed from here was erroneous.

Reversed, with directions to dismiss without decision or any indication of opinion upon the merits of the plaintiffs' claim to tax exemption.